Would the court please re-open the court? Court of Illinois. Good afternoon everyone. Pleased to see you. Our first and only case this afternoon is Carr v. Koch. Koch! Three shots at it and I didn't even get it in there. This is 4-1-1-0-1-1-7. And we have for the appellate, Tacey Flint, and for the appellate, Paul Burks. And you may toast. Thank you, Your Honor. May it please the court, counsel, I'm Tacey Flint. I'm here on behalf of the plaintiffs, Mr. Carr and Mr. Newell. The circuit court in this case dismissed the complaint in reliance on the Illinois Supreme Court's 1996 decision in Committee for Educational Rights v. Edgar. That case held that inequality in a prior version of Illinois' school funding system was justified based on a legitimate interest in local control of education. As the complaint shows, and as is confirmed by the amicus brief filed by West Aurora's local school district, local control has been all but eliminated in Illinois. The state has imposed mandatory statewide Illinois learning standards, which compels school districts to meet detailed and closely prescribed standards. Was that the state's idea or the federal government's idea? The state's action in 1997 preceded No Child Left Behind. That's what you're referring to. So it was the state's idea, I guess. But in any event, the state does enforce the Illinois learning standards, which is what's significant here for the effect that the state's enforcement of the learning standards has on tax rates in local school districts. In particular, the way the state enforces the learning standards is through mandatory statewide testing that's specifically pegged to the learning standards. And local school districts whose students don't meet standards based on that testing are subject to severe penalties, including a maximum penalty of having the state take over control of education in that district. But that is not what happened here under these circumstances. That's not part of the complaint. That has not happened in Plankton's local school districts. Nonetheless... Is it fundamental to your argument that you suggest that there's a correlation between school spending and student performance? Yes. What's the basis for that? Well, I have two answers. One answer is I think the state would agree with us that there's a correlation between spending and student achievement, because the state has created the foundation level. That's a level of funding set by the state and defined by statute to mean the level of funding that's needed to provide a basic education, the basic education in the words of the state. But additionally, it's how the degree of connection between spending and student achievement is certainly something we've alleged to be true. We've alleged that local school districts necessarily have to fund education in their districts at a... Well, here's my fundamental problem with the construct you pose. I'm just going to pull districts out of the area. If you live in Winnetka, which I presume is a pretty high dollar per student expenditure, you're dealing with the biological fact of a community being full of high earners, which coincidentally is probably because they're very intelligent people, or more intelligent than other areas of the state. And if you go to one of the smaller rural districts, where they don't have a high percentage of high earners, people who have not been as well educated as the parents of the students in Winnetka, you're substituting... You're looking at income levels disassociated from biology. Correct me if I'm wrong. So what you're asking about is... Your point is that school districts will have different funding needs based on populations. No. The students in those districts will have different innate abilities based on who their parents are. So students in a property-wealthy district may have greater achievement, you're saying? Maybe we don't even have to go to innate abilities. We can go to the expectation of parents will have of their children. I would presume, and this is again just kind of pulling out of the air, I would guess that parents in Winnetka are on their kids at home saying, you've got to get this done, no, we're checking your work, we've got to do this, you've got to work hard to excel, you've got to work hard to succeed in school, because our parents made us do that, we're making you do that, you're going to go to college, you don't have a choice about it, you're going to go to college, you're not going to go work in a lumberyard, you're going to go on in school and you've got to get good grades in order to get there. Whereas in a lot of other communities in the state of Illinois, college may not be an expectation, not because parents wouldn't want their kids to go to college, it's just, you know, there's no push, no drive, because you're dealing with a different set of parents here. Are you talking about the importance of local control of education so that parents... No, I'm going to the point of challenging your assertion that dollars equate to success. Well, I suspect, although of course there's no evidence in the case, but I suspect that you're right, that dollars, that there's no, it's implausible that there's a one-to-one correlation between dollars and student success. And I won't dispute that dollars help, obviously dollars help. Right, and I think, I would hope you also wouldn't dispute, and I think on the record of this case it can't be disputed, that there's a floor, there's a floor of spending below which no student can be expected to achieve a certain level of education. I mean, no student can be, no student can be expected to make it through kindergarten, 12th grade, you know, graduate from an Illinois public school on, you know, $100 a year. It's just not possible. No student could satisfy the Illinois learning standards on such a tiny yearly budget. Well, except that we haven't talked about the variable which is tied into the dollars. And that is the degree of dedication and innate skill of teaching on the part of teachers. And so it seems to me that, you know, stripped away, your argument basically is if you've got enough money in a district to hire minimum master's level people to teach school, and you're going to pay them well, therefore they're going to be super teachers. Whereas in a poorer district, where you've got people with, yes they've got a teaching degree, they're licensed to teach, but because they're not paid as much, they're just not as good. Is that basically your argument? I don't think we would, I don't think I would make an argument at that level of detail. I don't think we have the material on the case to go to that level of detail yet. But isn't that really the point that underlies your whole case? Yes, I mean I wouldn't focus exclusively on teachers, but, you know, educational background of teachers, lives, facilities, class size, all of these elements are undoubtedly helped by funding. And I think the state necessarily recognizes this much by creating a foundation level. If the state didn't believe that funding was necessary to provide a basic education, there would be no foundation level, there would be no such thing. Okay, and the state has done that? Yes. The state has said, here's your basic level. Everybody's got to be at or above this level. Right, $6,100. But then if it's individual district control, they can spend as much money as they can raise, right? That's true. Wait a minute, you're saying the state says it has to be at that level? No, the state does not say that it does not impose a requirement that a district actually spend that much or make that much, but the state has defined the term foundation level to mean the minimum. I just wanted to make sure I understood that. That's right. You're right, there's no statute. There's not even any requirement that taxes are assessed at the local level, is there? Not by the state. That's right. And in this case, as I understand it, a car paid at a rate of 4.1%. That's... Taxes, I'm talking about. Right, I'm just trying to remember. And rural was at 6.95%. 6.95%, right. And car paid at Homewood High School, that being a high school district, the state used 1.05% to calculate the district's available local resources. Because it was a high school district. So it was 1.05%. Is that right? That sounds right. Okay. And rural paid 6.95% to a unified school district, and the state uses 3%. That's right. To calculate the district's available local resources. Okay. So they both pay less than one-half of what the state uses to make its calculations. So how is there standing here? I mean, you mean they both pay more than what the state uses to make its calculations? Yeah, I'm sorry. I said it backwards. Yes. Right. The state's funding system, the fact that the state's funding system applies in an unequal way that inflates the property tax rate that property-poor local school districts have to impose. The state's funding system allows a local school district to get to the foundation level, let's just say we're talking about unified districts to simplify it, only if they tax at 3%. That effect applies even if the school district chooses to tax at a different rate because of a particular need in that school district. What we're challenging is the inflationary effect of the school's unequal funding system. Whether, even if a district makes a choice to tax at a higher rate, and by the way, I just want to make clear, we're not disputing the constitutionality of school districts to tax at higher rates, to choose to tax at higher rates. What we're disputing is the inability of school districts to choose a floor. And here, by having a system that forces property-poor districts to tax at a higher rate than property-wealthy districts to reach the foundation... That's where you're losing me. I'm trying to pause. How does it force them to tax at a higher rate? Well, there are two parts of my answer. One is, Your Honor seems very familiar with the way the system works. If you're available local resources times the specified rate, 3% if we're talking about unified districts, if that is less than 93% of the foundation level for a student, then state funding is not... They raise it to the foundation level. Property-wealthy districts, by definition, let's talk about flat-grant districts, by definition, those districts are well above, double, say, the foundation level if they tax at 3%. It's 175% and up. Then they get $218. And they still get $218. And in between, they get it on a sliding scale of 5% to 7%. That's right. Okay. So, a school district flat-grant district, let's say it's a district that's at 200% just to make the calculations easier, even though it's 175% and up in the statute. So that flat-grant district only has to tax at a rate of half of the state-specified 3% rate in order to get to the foundation level plus $218. Now, that's the first side. So, in order to get to the foundation level, there's no doubt, it's 100% clear from the face of the statute, flat-grant districts, half of the state-specified rate, foundation-level districts, all of the state-specified rate. So that's clear. It's the effect of the mandatory learning standards that brings the compulsion into the equation. Because districts are no longer permitted to say, I don't really care about the foundation level. You know, that's the number the state has set. But, you know, we feel like we've got great parents in our district who are going to contribute on an in-kind basis. So we don't need to tax at 3%. But that's not allowed anymore because we have to meet specific Illinois learning standards. It designates curriculum. It designates, I mean, some of the examples from the West River Brief are pretty, show you just how specific it is. It talks about learning about individuals, the role of Ben Franklin in the Revolutionary War, kinetic theory. I frankly don't, I didn't learn that when I was in high school, but kids today are learning it, I guess. Anyway, so districts can't choose to prioritize other objectives. They now must focus their curriculum on meeting the Illinois learning standards. So while your Honor is correct that the funding system itself, the state still gives funding no matter what rate you tax at, by imposing the mandatory learning standards on the other end, the state has taken the choice all the way out of it. Now, to get back to your original question, these districts have taxed at an even higher rate. The fact is, the foundation level is what the state has said is necessary for basic education. That's, it's not clear whether that is the same thing as an education that satisfies the Illinois learning standards. And it may well be that districts have to spend more than the foundation level to satisfy the Illinois learning standards. And I would note, as a matter of public record, the state has, in this same funding statute, the state has created the Education Funding Advisory Board, which is a group of, essentially a group of experts that's there to advise the legislature on what the foundation level should be. And... Should we put quotations around experts? They're not, well, I don't think they're all required to be PhDs, for example, but they are trusted sources. And in 2004 and 2006, the two years that the Education Financing Advisory Board actually studied the question, they recommended a foundation level substantially higher than the foundation level that exists, than the foundation level that the state adopted. So... Well, are the students in these two school districts meeting the state's performance standards? I'm not aware of sanctions by the state for failing to meet the performance standards. That doesn't, and I kind of started off with this a few minutes ago, but doesn't that get back into the question of standing? The plaintiffs here are taxpayers. They're not, you know, students or parents or teachers or school districts themselves. So, what matters is not whether the students are, in fact, meeting the standards or whether the district has been sanctioned, but whether these two plaintiffs have been forced to pay higher tax rates than similarly situated taxpayers in other districts because of the effect of the learning standards. And, as we allege... But you're saying the learning standards interfere with local decision-making, so it all kind of has to tie together in order for standing to be conferred upon the plaintiffs here, doesn't it? Or if I'm missing something... No, it does tie together. I agree with you. The way that it ties together is that the force of the learning standards requires school districts to educate to a certain level. The West Regoria brief details this. West Regoria isn't a school that's been sanctioned and is now run by the state. It's a school that's coping with the learning standards to avoid sanctions. As the West Regoria brief shows, day in and day out, the learning standards put severe requirements on it that it needs to expend its funding to satisfy. Local school districts do have some control over the tax rates, don't they? It's true that they have discretion to set the tax rate, yes. And the statute doesn't mandate a specific tax rate. But they no longer have the ability to choose a tax rate below that necessary to achieve the Illinois learning standards. And it was just that kind of choice of local districts on spending... I see my time is up. We'll have time to rebuttal, though. That was an issue in Edgar. That's the kind of choice that no longer exists. Appreciate it. Counsel? Thank you. Good afternoon. My name is Paul Burks. I'm an assistant attorney general, and I'm representing the defendants in this appeal. If I may just thank the court for accommodating my schedule this morning, I appreciate your flexibility. And then I would like to engage in the discussion that Justice Turner principally was having about what the state's role here is in terms of the injury that these plaintiffs suffered. And then after that, maybe talk a little bit about Edgar. And the position that we've taken, and I think it's clear from the law and from the briefs, is that the state is really not responsible for plaintiffs' tax rates. The state's only distinction in its funding statute between property-poor districts and property-rich ones is that it gives more money to the property-poor districts. The gap between their available local resources and the foundation level is greater. So the only distinction that the state directly plays between these property-poor and property-rich districts is to provide more funding to the poor districts, to the plaintiffs' districts in this case. So the claim here isn't that the state is setting the tax rates. It's that the state is forcing the local districts to set tax rates that are higher. Now, the council has acknowledged and conceded that the statute doesn't require the local districts to set any particular tax rate. The amount of money the state gives to each local district does not depend on their tax rate. They could tax at zero, and they will get the exact same amount from the state as if they tax at 7% or if they tax at the assumed statutory rate of 3%. There is no difference. The state does not play favorites that way. So the argument then becomes, well, if they didn't tax at the assumed rate, they wouldn't reach the foundation level. The state does not penalize any school district that does not reach the foundation level. There is no statute that says you must reach the foundation level. The state provides that guidance. It says this is what we believe to be a minimum required amount for the school districts and the school boards to know what our view is on that. But if a school district decides to tax at a lower rate and not reach the foundation level, there is no penalty. So they go one step further and they say, well, if we didn't tax at least at the level to reach the foundation level, then we can never satisfy the Illinois Learning Standards. But there is no penalty for not satisfying the Illinois Learning Standards. And I think it is very clear from the law we have laid out in the brief. What the penalties are is if you fail to make progress towards the Illinois Learning Standards, make progress, meaning move your test score slightly in the direction of where the standards are, for eight consecutive years, the state then has the right to take remedial action. That's the only, and that's a very attenuated, extremely attenuated injury from the tax rates that are allegedly form the basis of standing here. So even with that attenuated injury, they haven't identified a school district that suffered that injury. They haven't identified a school district that's sort of been put under some kind of advisory decree and had to raise their tax rates in order to fund more money into education, in order to meet the learning standards, in order to avoid the penalty. There's no such allegation in this complaint. It's an entirely speculative injury that they've identified. What difference does it make whether the state has control or the local districts have control? Well, I think Edgar articulated really well what a difference it makes. I mean, some school districts, and I think Justice Appleton sort of put his finger on it a little bit, some school districts have a lot of parents who are maybe more committed to advanced degrees in education and are going to want to spend more money, raise more money, invest more money in their school than other districts might want to do. So by allowing local districts to make those kind of judgment calls and determine the amount of money they want to spend, you facilitate the liberty of every family in the state to spend the money they want on the education of their children. So I think it makes a difference probably to parents in the school districts as well that they have some access to local decision makers who are determining the amount of money that's going to be spent. How does that affect standing? Well, I mean, I think the core question for us at standing is if we don't set those tax rates, if the state is not responsible ultimately for setting plaintiff Mr. Newell and Mr. Carr's tax rates, then they don't have standing to sue the state because their injury is not fairly traceable to us. So if ultimately, as counsel I think acknowledged, the local districts set the tax rates. I guess you couldn't complain that the local district is denying equal protection because it's setting a single tax rate. For the entire district, yes. For the entire district. Right. You've got to somehow combine the two districts. And that's why they're trying to say that the state of Illinois is running the show. Right, because it helps their claim. It doesn't make it lawful. And it doesn't change the fact that the state doesn't control those rates, that local school districts determine those rates. Isn't it true the state does have some control? Well, the state does balance local control and the liberty of individual families and school districts with some kind of uniform standards. And I think that parents and school districts expect that from the state to say, look, we have experts, panels that have looked at these questions and we can tell you what's required to be successful in the world going forward and what people should be learning at certain times. And we can set standards, provide them to you as guidance, the local districts as guidance, and monitor whether or not you're doing a good job of providing that education to all of Illinois students. So there is a balance between equality, making sure all students get at least a minimum level, even if they're in a school district that doesn't prioritize it, and liberty, allowing those school districts that want to prioritize education more to spend more money and tax their citizens more. So there is a role to be played, but it's a nuanced role that is subject to balancing and that the legislature is sort of constantly reworking between the equality that's necessary for all Illinois students and the liberty that's necessary for those districts to have some authority over what they're going to do. So, yes, there is a role for the state. But it's not the role that compels a certain taxing level. And it's just as Turner pointed out, I mean, the final step really in the standing question is even if you assume that the states assume tax rates were mandatory, that for a unified school district, 3%, the state required it. And for the reasons I stated, we don't require it. There are no penalties for using a different tax rate. As Justice Turner pointed out, the rates here are two, three times higher than what the assumed rates are in the statute. So how could the state be responsible? Even if the state compelled Plaintiff Newell's, Mr. Newell's Taxing District, to tax him at 3%, how could the state be responsible for the fact that they taxed him at 7? There's really, the link is just too attenuated, too abstract, to really form the basis of standing in this case. Now, I would like to turn briefly to Edgar, which did present a similar question. So if we assume that the plaintiffs have standing to sue the state, then the question becomes, one of the questions, is whether or not the state's funding system, which relies heavily on property taxes, satisfies equal protection. And the plaintiffs have acknowledged that this is a rational basis question. That is, is the state's funding system rational? Does it satisfy a legitimate state interest? And that is fundamentally the same question that was asked in the Edgar case. In that case, the plaintiffs were schoolchildren, who said that we in low property, in poor property districts, are getting less education, or poor education, than those in rich property districts. Here it's the taxpayers in the poor property districts who are saying, well, we're required to pay a higher percentage. But both claims derive from the exact same policy, which is the state's decision to fund local education through a combination of local property taxes and state aid. So the question is the same. Is that policy, is that statute that does that, is that rational? Is it rationally related to a legitimate state interest? And I think the decision in Edgar, if you look at the rationale of Edgar, it applies equally here. There's really no distinction here. Because what Edgar said is the state has to balance local control and equality. It has to balance providing a certain minimum level to everybody with allowing some school districts to exceed that. It has to determine what the proper balance between those two policies are. And in Edgar, they really went out of their way to say, look, there's range here for those policies. There's range to balance them. There's not a single spot on the continuum where it's right. The policy makers and the parents and those interested in education have to continually make a decision about whether more local control or less local control is appropriate. So in Edgar, they affirm the system. It's the same system fundamentally. It has moved a little bit more towards equality, a little bit away from local control in the sense that the state is now funding to low-income schools. So there's a little bit more redistribution, a little bit more equality. There's the Illinois Learning Standards. They have provided those to all students. So there's a little bit more equality there, too. But they haven't, as plaintiffs allege, really conclusorily, in a conclusory fashion, allege that they've abandoned local control. That's simply not true. It's still the local school districts that hire the superintendents, hire the teachers, which is probably the most critical factor in whether or not they're going to provide good education. That's a local school district's decision. Enter into collective bargaining agreements. Local school districts do that. Decide what they're going to pay their superintendent. Local school districts do that. And decide the taxing rate. Local school districts do that. So to say that because the state has provided these standards that it believes should apply across the board, it has taken over, a school district is just a conclusion that is not borne out by the facts or by the allegations. Now, all those things that I've listed that school districts do, those are statutory obligations. They're in 105 ILCS 5-10, which is a title entitled School Board Responsibilities. And you can go through and see that they're responsible for hiring teachers, entering into collective bargaining agreements. Would you agree there's less local control today than there was at the time Edgar was decided? I would say there's a little bit less local control today than the time Edgar was decided. Yes, I would say the alumni learning standards sort of on their face indicate more of a state role in recommending curriculum. So that alone, I think, would say, okay, well, we've gone to more of a uniform. How much local control has to be usurped before Edgar no longer applies? It's not there yet, but we're getting there? Well, it would have to be pretty extreme, honestly, because what Edgar said is legislators and parents and school boards, everybody's interested in education, and the political process will do a pretty good job of determining that balance. And only when the state's funding mechanism is so out of whack where it's gone all the way to one side or another that no rational person could believe this is the right way to balance local control and equality, only then does it violate equal protection. Remember, this is a rational basis. So when you're talking about something that's so dear to the heart of so many citizens of Illinois, I think the Illinois Supreme Court was saying, put it in the political arena where it belongs, and the people will come up with a balance that's rational. And they have come up with a balance that's rational. They've moved it a little bit from where it was in 1996. It might move back. But you have to let the political process decide that. Until it gets so far beyond the pale where the conclusions that they've made are actually borne out, where there is mandatory, there's takeover of school districts, things like that. If there were allegations like that in the complaint, we might have a closer question. So I've addressed standing and I've addressed Edgar. There are a couple other arguments in my brief, but I'm not going to go through them orally unless there are any questions. It does not appear to be. Thank you very much. Rebuttal, please. Thank you, Mayor Benner. Just a few points. First, a couple of times, counsel for the state indicated that, I believe he said, there are no sanctions for failing to meet the Illinois Learning Standards. There's no doubt that that's incorrect. There are sanctions for failing to meet the Illinois Learning Standards, and they can include eventually taking over the entire school district. And I encourage the court to look at the West Aurora brief in this regard. The local standards, the learning standards, have a profound effect on education. And to echo a statement or question by Justice Cook, it's clear that the state is running the show with the learning standards. The state is running the show about the core functions of learning and education in Illinois. It sounds to me like the state is setting minimums, but as Justice Turner said, the taxes are way above the minimums. So what difference does it make if the state is setting minimums? The taxes are above the foundation level. There's nothing to suggest that the taxes are above what's needed to meet the Illinois Learning Standards, which may be something different from the foundation level. And even, the point is that if two districts need to spend, to satisfy the Illinois Learning Standards, two districts need to spend $10,000 per student per year, a much higher, the district that, a taxpayer in the district that is property poor is going to have to pay substantially more. Let me ask you this, what's your solution to all this? Well, one possible solution would be a greater state role in education financing. If the state, for example, a complete takeover of state education funding, that would eliminate... But if you do that, is the state still going to be taxing one area at a higher rate than the other? The state would need to fund education in a manner that... Are you saying do away with the property tax? No, I'm not saying that. If, take the property tax rate that is the tax rate of the wealthiest district for purposes of meeting the funding necessary to meet the Illinois Learning Standards and impose that on all districts. One uniform rate throughout the state? Right. Another way to accomplish it would be to impose one uniform rate throughout the state, pool the money, and distribute it to districts that way. So you agree, don't you, that's an argument you need to take across the street? Absolutely, and we are not asking for that remedy to be imposed. We're just seeking a deperatory judgment. You just want us to say it's bad, to throw it out. You don't want us to... you don't have a solution that would be reached in court. I do have a solution, but we haven't asked for an injunction or anything along those lines. Well, by the same token, don't you think we're bound to follow Edgar, and if it no longer applies, isn't it up to the Supreme Court to say so? It's not that Edgar no longer applies. It's that Edgar is still good law. We don't challenge that. The situation has dramatically... the factual situation is not the same situation that was presented in Edgar. So it doesn't apply. It doesn't govern these facts. It's a matter of semantics. Okay, I get what you're saying. I'm sorry. There was a case on standing. I can't remember if you cited it or not. P&S Grain, LLC. And one of the things they say, to have standing, the actual or threatened injury claimed by a plaintiff must be distinct and palpable, fairly traceable to the defendant's actions, and substantially likely to be prevented or redressed by the grant of the requested relief. Right. Well, if we just throw out the tax, we aren't solving any problems. If the funding system that currently exists were declared unconstitutional, I mean, I think it's fair to assume that it would be replaced by a constitutional funding system, one that didn't impose an unequally high tax rate.  But we would be creating such a disaster that somebody else would come up with a solution in the next few months. Well, I wouldn't suggest that. As I noted, we didn't seek an injunction. We're not asking for the school funding system to be tossed out and, you know, this to be the Wild West of education. We've asked. There's no doubt that it is the province of this court, the courts in Illinois, to consider equal protection questions. The Edgar Court made that completely clear. It held that the question of what a quality education was was non-justiciable. And actually, that's the context in which the discussion the council was referring to about putting it out for public discussion. That's what the Edgar Court was talking about when it said those things. It was talking about whether an education constitutes a high-quality education. But when it came to equal protection, the court examined the funding system, completely accepted its role as a court to determine whether the equal protection clause had been violated, and concluded on the facts before the court in 1996 that it hadn't been. Okay. The court thanks both of you for your arguments. The case is submitted. And the court stands in recess until further call.